**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 05-00655 JSW |
| v. | |
| GUINDI GUINDI, | **ORDER DENYING MOTION TO SUPPRESS EVIDENCE** |
| Defendant. | |

## INTRODUCTION

This matter comes before the Court upon consideration of the motion to suppress evidence filed by Defendant Guindi Guindi ("Guindi"). The Court has considered the parties' papers, including the supplemental briefs ordered by the Court, relevant legal authority, the record in this case, has held an evidentiary hearing, and has considered the arguments of counsel. For the reasons set forth in the remainder of this Order, the Court HEREBY DENIES Defendant's motion to suppress.

## BACKGROUND

**A.     Factual Background.**

Guindi is the founder and Chief Executive Officer of a company called Netcap Holdings, Inc., which Guindi characterized as a venture capital business in the formation stage. (Indictment, ¶ 1; January 17, 2008 Transcript of Hearing on Motion to Suppress ("Tr.") at 12:16-23.) Netcap leased office space at 151 Old Country Road, San Carlos, California from Gary Pollack ("the Netcap offices"). (Declaration of Gary Pollack ("Pollack Decl."), ¶¶ 1-2; Plaintiff's Consolidated (1) Motion to Strike Submission of Defendant's Submission of FBI

1 Reports; and (2) Opposition to Defendant's Motion to Suppress Electronic Files ("Opp. Br."),
2 Ex. 1 (Lease Agreement); Tr. at 13:10-15.)

3       At some point during the lease term, Netcap was unable to pay the rent on the Netcap
4 offices. (Tr. at 13:19-23; Pollack Dec., ¶ 4.) It is undisputed that Guindi and Netcap eventually
5 vacated the Netcap offices, but Guindi testified that he attempted to obtain an extension to pay
6 the rent. He also testified that he told Pollack that, if he was unable to pay the back rent,
7 Pollack could have any furniture left in the Netcap offices. (Tr. at 14:1-10, 21:20-24; Pollack
8 Decl., ¶ 5.) In addition to the furnishings, it is undisputed that there were a number of
9 computers in the Netcap offices. Guindi testified that he left them in the Netcap offices but did
10 so with the understanding that Pollack would let him retrieve them at a later date. (Tr. at 14:11-
11 21.) On August 2, 2001, Pollack served Guindi and Netcap with a summons in an unlawful
12 detainer action. (Gov. Hearing Ex. 1; Tr. at 25:14-20, 35:14-36:3.) On December 10, 2001, the
13 Superior Court issued an amended judgment in Pollack's favor. (*See* Tr. at 53:15-54:19; Gov.
14 Hrg. Ex 2 (Writ of Execution); 3 (Return on Writ of Possession); Gov. Supp. Opp. Exs. 1-8.)[1]

15

16       In 2000 or 2001, Guindi and Netcap were named as defendants in a civil lawsuit filed
17 in Marin County Superior Court, *Schwartz v. Guindi*, CV-0011146. (Declaration of Steven
18 Dillick ("Dillick Decl.") ¶ 2; Tr. at 50:14-51:2.)[2] During the course of the civil lawsuit, Steven
19 Dillick, an attorney representing the plaintiffs, contacted Pollack and asked for access to the
20 Netcap offices and records. Pollack advised Dillick's that he would grant him access to the
21 Netcap offices if subpoenaed to do so. (*See* Mot., Ex. E (Pollack 302 at 2).) Dillick duly
22 obtained a subpoena. (*Id.*; Dillick Decl., ¶ 3; Tr. at 63:5-9.)

---

[1] There is additional testimony and evidence in the record on the issue of abandonment. Because the Court's ruling does not rest on that issue, it does not recite those facts herein.

[2] According to Alan Schwartz, one of the plaintiffs in this lawsuit, the claims "were that money was raised for the purchase of IPO stock in publicly traded companies. The IPO stock was never purchased. The funds were disbursed, and used for other purposes. The stock never existed. And when it came time to – to receive the stock for which the money had been given, it wasn't forthcoming. The money wasn't forthcoming, and investors' money was lost." (Tr. at 59:1-10.)

2

On or about April 9, 2002, Dillick, Alan Schwartz ("Schwartz"), one of the plaintiffs in the civil suit, and John Berryhill, a computer forensic expert, went to the Netcap offices and imaged the hard drives of the computers and copied the contents on to CD-ROMs.[3] (Tr. at 60:5-9, 60:18-61:2, 65:3-66:1, 68:11-69:19; Gov. Hrg. Ex. 4 ("Evidence Inventory").)[4] According to Schwartz, Berryhill provided him with a set of 11 CDs, which contained the human readable information on the Netcap computers. (*Id.* at 67:15-23.) Schwartz testified that this content was divided into two general categories: files and folders that could be copied directly off the hard drives; and "unallocated clusters," which Schwartz described as "deleted content, where a file has been deleted or edited or changed, but some of the text material behind it is still out on the disk." (*Id.* at 71:5-19.) Based on the testimony adduced at the hearing, none of the data on the Netcap computers was encrypted, although some of it may have been password protected. (Tr. at 48:14-49:8, 55:13-19, 83:9-19.)

Schwartz further testified that he reviewed both categories of materials. He used a text editor to inspect the unallocated cluster files and testified that he visually inspected all of the material in the unallocated cluster files and opened the materials in the files and folders. (*Id.* at 73:10-20, 74:7-14, 78:18-82:5.) Schwartz also testified that he performed key word searches to review the materials on the CDs. (*Id.* at 73:21-74:6, 76:9-77:25.) Schwartz testified that he "attempted to systematcially open every single file on all of the CDs that were provided," and that he, in fact, opened every file on the CDs and scrolled through the data that was visible on his computer screen. (*Id.* at 74:15-76:6, 78:18-82:5.) Schwartz acknowledged that he did not read each and every document contained in a given file. (*Id.* at 80:10-15.) Finally, Schwartz testified that of the materials he reviewed on the CDs, "I didn't find anything ... that we didn't have in a paper form or that had been received by someone in electronic form and offered as part of – as part of what was germane to this case." (*Id.* at 82:9-21.)

---

[3] Pollack later disposed of the actual computers.

[4] On or about January 8, 2004, the Federal Bureau of Investigation ("FBI") interviewed Dillick, who advised the FBI that he had boxes of Netcap business records that he was willing to provide to the FBI. Dillick also advised the FBI that Berryhill still had the imaged hard drives in his possession. (Mot., Ex. F (Dillick 302 at 2).)

3

1    Guindi acknowledges that he did not file a motion to quash the subpoena that Dillick
2 obtained.  However, Guindi testified that he did not learn that Dillick had imaged and reviewed
3 the hard drives of the Netcap computers until after Dillick had obtained the information.  Guindi
4 did testify that once he learned this information, he asked Brant Girard, a lawyer who had been
5 representing him on the civil matter, to contact Pollack and Dillick and raise an objection to the
6 fact that Dillick had been permitted to copy this data.  (Tr. at 30:18-31:11, 51:24-53:1; Mot.,
7 Ex. E (Pollack 302 at 3); *but see* Dillick Decl., ¶ 11 ("Neither Mr. Guindi, nor anyone on his
8 behalf has ever contacted me to demand return of the CD-ROMs, or to assert any privacy
9 interests in the CD-ROMs.").)

10   On October 18, 2005, Guindi was indicted on nine counts of wire fraud in violation of
11 18 U.S.C. § 1343, two counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of
12 financial transactions to promote unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(I).
13 (Docket No. 1 (Indictment).)  In brief, the Government alleges that Guindi "raised investment
14 funds from two different, but overlapping and interlocking components: (A) raising investment
15 funds through the purported purchase of restricted socket in various well-known companies;
16 and (B) raising investment funds by and through ... Netcap." (Indictment, ¶ 4.)  The
17 Government alleges that both schemes were designed to defraud potential investors.

18   In February 2006, the FBI received copies of the imaged hard drives from Berryhill.
19 That material was contained on five DVDs.  (Declaration of Special Agent Keith Nelson
20 ("Nelson Decl."), ¶ 2.)  On March 1, 2006, the Government advised Guindi that it had obtained
21 copies of the imaged hard drives and requested his consent to search the DVDs.  (Mot., Ex. G.)
22 Guindi refused to consent.  Notwithstanding Guindi's refusal, and based on its belief that
23 Guindi had no reasonable expectation of privacy in the drives, the Government reviewed the
24 DVDs.[5]  (Mot., Ex. I.)  Specifically, Special Agent Nelson averred that the FBI reviewed "some
25 of the documents contained in [the] DVDs" and that "[t]his review consisted solely of

---

[5]     The Government suggested to Guindi that it might pursue a search warrant, but did not follow through on this suggestion.  It also purported to obtain consent to review the materials from Lisa Middleton, a former Netcap employee.  (Mot., Exs. C, D, H.)  The Government does not attempt to justify the search based on Ms. Middleton's purported consent.

4

reviewing certain Microsoft Office documents that appeared relevant to the investigation, as well as key-word searches." (Nelson Decl., ¶ 3.) At the hearing, Special Agent John Posusney testified that he was in charge of the review of the DVDs. (Tr. at 118:19-21.) Special Agent Posusney did not speak with Berryhill or Schwartz about the extent of their review of the imaged hard drives. (*Id.* at 118:22-25.)

On November 1, 2007, Guindi filed a motion to suppress evidence based on the Government's search of the imaged hard drives. (Docket Nos. 71.) On December 6, 2007, the Court held a hearing on the motion to suppress, heard argument from counsel, and ordered further briefing. (*See* Docket No. 83.) The Court set the further hearing on the motion for January 17, 2008. (*Id.*) On January 17, 2008, the Court held an evidentiary hearing on (1) the circumstances surrounding Guindi's departure from the Netcap offices and the disposition of the property contained in that space; and (2) the scope of the private search of the imaged hard drives and computer files in comparison to the scope of the Government search.

## ANALYSIS

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ... ." U.S. Const. amend IV. Under the Fourth Amendment, "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also United States v. Chan*, 830 F. Supp. 531, 533 (N.D. Cal. 1993) ("A person has an interest that warrants Fourth Amendment protection when that person maintains a legitimate expectation of privacy in the invaded property.") (citing *Rakas v. Illinois*, 439 U.S. 128, 142-45 (1978)). A defendant may establish the requisite standing to challenge a search when he or she can "show: (1) a subjective expectation of privacy; and (2) an objectively reasonable expectation of privacy." *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007). Guindi bears the burden of proving both elements. *Id.*; *see also United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991).

The Ninth Circuit has noted the difficult questions presented under the Fourth Amendment when computer searches are at issue. *See United States v. Comprehensive Drug*

5

*Testing, Inc.*, 513 F.3d 1085, 1108 (9th Cir. 2008) (quoting *United States v. Adjani*, 452 F.3d 1140, 1152 (9th Cir. 2006)). "Computers are simultaneously file cabinets (with millions of files) and locked desk drawers; they can be repositories of innocent and deeply personal information, but also of evidence of crimes. The former must be protected, the latter discovered. As society grows ever more reliant on computers as a means of storing data and communicating, courts will be called upon to analyze novel legal issues and develop new rules within our well established Fourth Amendment jurisprudence." *Adjani*, 452 F.3d at 1152 (footnote omitted).

Notwithstanding the difficulties associated with computer searches, the protection afforded by the Fourth Amendment applies only to "governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Jacobsen*, 466 U.S. at 113 (quoting *United States v. Walter*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). Here, the Government searched the data obtained from the Netcap computers *after* that data had been searched by the litigants in the civil suit against Guindi. Thus, assuming without deciding that Guindi had an expectation of privacy in the material contained on those computers, any additional invasion of his privacy by the Government "must be tested by the degree to which they exceeded the scope of the private search." *Jacobsen*, 466 U.S. at 115 (citing *Walter*, 447 U.S. 649).

In *Walter*, boxes of film addressed to Leggs, Inc. were delivered mistakenly to a company that accepted deliveries for L'Eggs Products, Inc. When employees of that company opened the boxes, they found film containers with labels that suggested that the films were sexually explicit in nature. *Walter*, 447 U.S. at 651-52. The employees also attempted to view some of the films contained in the boxes by holding them up to the light. *Id.* They subsequently called the FBI, an agent retrieved the packages, and agents then viewed the films on a projector, without obtaining a warrant. After determining that the films contained obscene material, the defendants were charged and subsequently filed a motion to suppress the evidence, which was denied. *Id.* at 652.

6

The Supreme Court reversed. It reasoned that, although the FBI agents may have obtained the films lawfully, that fact "did not give them authority to search their contents" without a warrant because it was well established that "an officer's authority to possess a package is distinct from his authority to examine its contents." *Id.* at 654. The Court also stated that "the fact that the packages and one or more of the boxes had been opened by a private party before they were acquired by the FBI [does not] excuse the failure to obtain a search warrant." *Id.* at 656; *see also Chan*, 830 F. Supp. at 534 (citing *United States v. Chadwick*, 433 U.S. 1, 10-11 (1977)) ("[a] warrant may be required to search the contents of a container when its owner's expectation of privacy relates to the contents of that container rather than to the container itself;" holding that defendant maintained a reasonable expectation of privacy in the contents of a pager's memory). Although the government argued that the private search gave it authority to conduct an unlimited search of the films, the Supreme Court rejected that argument. "If a properly authorized official search is limited by the particular terms of its authorization, at least the same kind of strict limitation must be applied to any official use of a private party's invasion of another person's privacy." *Id.* at 657. Because the government search was more extensive than the private search and disclosed information about the films about which "one could only draw inferences," the Court held that the search violated the Fourth Amendment. *Walter*, 447 U.S. at 657-58.

In *Jacobsen*, the private search in question was conducted by Federal Express employees who opened a damaged package pursuant to company policy. "Inside the box five or six pieces of crumbled newspaper covered a tube about 10 inches long; the tube was made of the silver tape used on basement ducts. The supervisor and office manager cut open the tube, and found a series of four zip-lock plastic bags, the outermost enclosing the other three and the innermost containing about six and a half ounces of white powder." *Jacobsen*, 466 U.S. at 111. The employees then called the Drug Enforcement Administration ("DEA") and "replaced the plastic bags in the tube and put the tube and the newspapers back in the box." *Id.* When a DEA agent arrived, he re-opened the tube, removed the plastic bags and saw the white powder. The agent then opened each of the four bags and conducted a field test, which showed that the

7

1   powder tested positive as cocaine. *Id.* at 111-12. The Supreme Court found that the agent did
2   not violate the Fourth Amendment when he removed the bags from the tube, because the visual
3   inspection of the bags "enabled the agent to learn nothing that had not previously been learned
4   during the private search." *Id.* at 120. The Court also upheld the field test on the ground that it
5   did not disclose a fact for which there was a "legitimate privacy interest." *Id.* at 123.

6   In *United States v. Mulder*, 808 F.2d 1346 (9th Cir. 1987), the Ninth Circuit concluded
7   that a subsequent government search did violate the Fourth Amendment where the government
8   conducted laboratory tests on pills found by a private party in the defendant's hotel room. In
9   that case, a hotel security guard, believing that the defendant had abandoned the room, entered
10  the room and found a locked bag. The security officer broke the lock on the bag and "observed,
11  among other items, ten clear plastic bags containing tablets inscribed with the lettering
12  'LEMMON 7/14.'" *Mulder*, 808 F.3d at 1347. The security officer contacted the police, who
13  in turn contacted the DEA, which retrieved the bag and sent the plastic bags to a laboratory in
14  order to test the tablets. *Id.* The Ninth Circuit concluded that "[w]hile the circumstances of the
15  visual search and seizure of the bags of tablets did not infringe the fourth amendment," the DEA
16  exceeded the scope of the private search when it sent the tablets to the lab for thorough testing.
17  *Id.* at 1348-49. The Court distinguished *Jacobsen* on the ground that, in *Jacobsen*, the agent
18  conducted a field test, "which could merely disclose whether or not the substance was a
19  particular substance." *Id.* at 1348. In contrast, in Mulder's case, the subsequent search
20  involved "a series of tests designed to reveal the molecular structure of a substance and indicate
21  precisely what it is," which "could have revealed an arguably private fact." *Id.* at 1348-49.

22  In *United States v. Bowman*, 215 F.3d 951 (9th Cir. 2000), the court also confronted the
23  issue of whether a subsequent government search exceeded the scope of a private search. In
24  that case, after the defendant failed to pay rent, the manager of a storage company opened two
25  of the defendant's lockers, for the purpose of selling the contents. When the manager
26  discovered silencer parts, a bullet proof vest, a police scanner, and some videotapes, he
27  contacted the ATF. The ATF sent an agent to examine the contents of the foot lockers. *Id.* at
28  956. In addition to reviewing the contents, the agent also viewed one of the videotapes and

8

dusted the outside of the videotapes for fingerprints. *Id.* at 963. The defendant moved to suppress the evidence, and the district court denied his motion. On appeal, the Ninth Circuit held that "[i]t is clear that the agent's search is permissible, and constitutional, *to the extent that it mimicked* the private search conducted by the manager of" the storage facility. *Id.* at 963 (emphasis added). The court also noted that "[i]n two respects, however, the agent's search *differed* from the private search." *Id.* (emphasis added). First, he viewed one of the videotapes, which the government conceded exceeded the scope of the private search and therefore violated the Fourth Amendment. *Id.* at 963 & n. 7. Second, he dusted the outside of the videotapes for fingerprints.[6]

The opinions in *Mulder* and *Bowman* suggest that the focus of the Court's inquiry should be on whether the subsequent government search discloses information as to which a defendant's expectation of privacy has not been frustrated. In other words, did "the government learn[] something from the police search that it could not have learned from the private searcher's testimony and, if so, whether the defendant had a legitimate expectation of privacy in that information." *United States v. Runyan*, 275 F.3d 449, 461 (10th Cir. 2001) (citing *Jacobsen*, 466 U.S. at 118-20).

This Court finds *Runyan* to be particularly on point. In that case, the defendant's ex-wife and two of her friends entered the defendant's home and barn, without his consent, to retrieve items that she contended were her personal property. During a search of the barn, one of the friends found a duffel bag containing pornography, compact disks, and other materials of a sexual nature. The defendant's ex-wife and her friends also removed a desktop computer, some floppy disks, CDs, and "ZIP disks" (hereinafter "the disks") from the defendant's home. *Runyan*, 275 F.3d at 453. One of the friends viewed some of the disks and discovered that they contained images of child pornography. *Id.* Thereafter, the defendant's ex-wife provided law enforcement agents with the disks and the other materials she had obtained during her search. Law enforcement agents reviewed the materials and then obtained search warrants to search the

---

[6] The court did not reach the issue of whether testing for fingerprints exceeded the scope of the private search. *Bowman*, 215 F.3d at 963.

9

1  computer and all the disks for files that contained illicit materials and to search defendants'
2  house for other computers and associated hardware and software. *Id.* at 454. The defendant
3  challenged the pre-warrant searches, and the district court denied his motion.

4  On appeal, the Tenth Circuit concluded that certain portions of the pre-warrant searches
5  of the disks violated the Fourth Amendment. *Id.* at 452. Relying on cases in which courts
6  concluded that "a police search exceeds the scope of a private prior search when the police open
7  a container that the private searchers did not open," the court concluded that the law
8  enforcement agents exceeded the scope of the private search when they examined disks that the
9  private searchers did not examine. *Id.* at 462-64 ("A defendant's expectation of privacy with
10 respect to a container unopened by the private searchers is preserved unless the defendant's
11 expectation of privacy in the contents of the container has already been frustrated because the
12 contents were rendered obvious by the private search."). In contrast, the court concluded that
13 the agents did not violate the Fourth Amendment when they examined the same disks that the
14 private searchers had viewed, but did so more thoroughly. *Id.* at 464-65 ("we find that the
15 police do not exceed the scope of a prior private search when they examine particular items
16 within a container that were not examined by the private searchers"). *See also United States v.*
17 *Simpson,* 904 F.2d 607, 610 (11th Cir. 1990) (government search did not exceed scope of prior
18 search where agents viewed the same materials as private parties but "took more time and were
19 more thorough" than the private parties); *but see United States v. Rouse*, 148 F.3d 1040, 1041
20 (8th Cir. 1998) (concluding that where police discovered additional items in luggage that private
21 parties already had searched, the defendant's reasonable expectation of privacy in those items
22 had not yet been frustrated, and the government search exceeded the scope of the private search
23 as to those items).

24 Although the imaged hard drives had been copied on to five DVDs for the Government,
25 rather than the 11 CDs that Schwartz reviewed, this case does not present a situation where the
26 government reviewed more disks than the private searchers, as was the case in *Runyan*.
27 Moreover, Schwartz testified that with one or two exceptions, he opened every file on the
28 eleven CDs and also scrolled through the materials contained on those files. The Court finds his

10

testimony on this point to be credible.[7]  Therefore, this case does not present a situation comparable to *Mulder* or *Rouse*, where during the subsequent search, the government discovered information as to which Guindi's expectation of privacy had not yet been frustrated. Therefore, the Court concludes that, on the facts of this case, the subsequent search did not enable the Government to "learn[] something ... that it could not have learned from the private searcher's testimony." *Runyan*, 275 F.3d at 461.  Accordingly, the Court finds that the Government's search of the imaged hard drives of the Netcap computers did not exceed the scope of the private search and, thus, did not violate the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence is DENIED.  The parties are FURTHER ORDERED to appear for a status conference on April 3, 2008 at 2:30 p.m.  At that time, the parties shall be prepared to set dates for the pretrial conference and trial.

**IT IS SO ORDERED.**

Dated: March 25, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

---

[7] The exceptions were files that were he could not open, and Schwartz testified that as to those files he "attempted to inspect with other software tools, ... to see if there was data inside them."  (Tr. at 79:24-80:9.)

11